

Howard Kleinhendler (HK 5712)
Julian D. Schreibman (JS 1124)
Sara G. Spiegelman (SS 4352)
WACHTEL & MASYR, LLP
110 East 59th Street
New York, New York 10022
(212) 909-9500
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MLSMK INVESTMENTS COMPANY,

                    Plaintiff,

          -v-

JP MORGAN CHASE & CO. and JP MORGAN
CHASE BANK, NA,

                    Defendants.

09 Civ. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff by its attorneys, Wachtel & Masyr, LLP, as and for its Complaint, hereby avers:

## NATURE OF THE CASE

1.      Plaintiff is a victim of the notorious Ponzi scheme perpetrated by Bernard Madoff ("Madoff"). Between October and December 2008, plaintiff deposited $12.8 million in a New York account at JP Morgan Chase Bank, NA ("Chase Bank") for credit to its account at Bernard L. Madoff Investment Securities LLC ("BMIS"), Madoff's broker-dealer. Plaintiff expected its funds to be used by Madoff to purchase and sell securities and to provide it with

steady positive annual returns. However, Madoff never invested plaintiff's money and instead misappropriated its funds in what were the last gasps of a nearly twenty-year fraud.

2.     But Madoff did not act alone. By September 2008, JP Morgan Chase & Co. ("Chase") unequivocally knew that Madoff's stated investment returns were false. Chase knew this through its due diligence investigation into Madoff's investment advisory business; its dealing with Madoff through Bear Stearns's market making desk, which it acquired in March 2008; and, from the Madoff bank accounts it held. Upon acquiring this knowledge, Chase entered into a conspiracy with Madoff and BMIS in violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* But for Chase's actions – which kept Madoff's criminal enterprise in business through December 2008 – the plaintiff would not have lost $12.8 million.

3.     In addition to conspiring with Madoff and BMIS, Chase also aided and abetted Madoff's breach of the fiduciary duty that he owed to plaintiff, engaged in commercial bad faith, and acted negligently in light of its knowledge of Madoff's criminal activity.

4.     Chase provided Madoff with at least two essential services after it knew that Madoff was a fraud. First, it continued to permit its brokers to trade with Madoff's market making business thereby providing Madoff with legitimate trading volume which he used to satisfy audits and inquiries from the SEC and FINRA, as well as to fool the targets of his fraudulent scheme. Second, it received and deposited cash from unsuspecting victims for Madoff's benefit and permitted him to use those funds in any manner he pleased, including the continued operation of his Ponzi scheme, as well as transfers to himself, his family, and his close associates.

**PARTIES**

5.     Plaintiff MLSMK Investments Company ("MLSMK") is a Florida partnership with a principal place of business in Palm Bach, Florida.  Each of MLSMK's partners is a Florida citizen.  Between October 6, 2008 and December 5, 2008, MLSMK caused $12.8 million to be transferred to BMIS by wiring the funds to BMIS' account at Chase Bank in New York City.

6.     Defendant JP Morgan Chase Bank, NA is a Delaware corporation with a principal place of business at 1 Chase Manhattan Plaza, New York, New York.  Chase Bank provides, among other things, commercial banking services.

7.     Defendant JP Morgan Chase & Co. is a global financial services firm and provides investment banking services; financial services for consumers; small business and commercial banking; asset management and private equity.  Chase is traded on the New York Stock Exchange and is a component of the Dow Jones Industrial Average.  It is incorporated under the laws of Delaware and maintains a principal place of business at 270 Park Avenue, New York, New York.

8.     Between 2000 and the present, Chase has filed consolidated financial statements with the SEC which include revenues from all of its operations, including revenues from Chase Bank.  Chase controls the operations of Chase Bank and guides its activity through a single corporate consciousness.

**JURISDICTION AND VENUE**

9.     This court has both federal question and diversity jurisdiction over this case pursuant to 28 U.S.C §§ 1331 and 1332(a)(1).

10.    Venue lies in this district pursuant to 28 U.S.C. § 1391.

## FACTS

### Madoff's Criminal Enterprise

11.     Until his arrest, and for the preceding forty years, Madoff owned and operated a broker-dealer business based in Manhattan.   Until 2000, Madoff operated under the name Bernard L. Madoff Investment Securities, a sole proprietorship owned by Madoff.   On or about December 4, 2000, Madoff formed BMIS, a New York limited liability company with offices at 855 Third Avenue, New York, New York, which took over all of Madoff's broker-dealer activities.   Between December 2000 and December 11, 2008, Madoff was the sole member and manager of BMIS.   Madoff also opened a branch of his broker-dealer business in London, England which was incorporated under the name Madoff Securities International ("MSIL"), which he principally owned and controlled.

12.     From its formation, BMIS was a broker-dealer registered with the Securities and Exchange Commission. BMIS purportedly engaged in three different operations, including investment advisor services, market making services and proprietary trading.   All of this activity was conducted from Madoff's offices in Manhattan.   By December 2008, BMIS employed nearly 70 people.

13.     A Market-Maker is a dealer who, with respect to a particular security, (i) regularly publishes bona fide, competitive bid and offer quotations in a recognized interdealer quotation system; or (ii) furnishes bona fide competitive bid and offer quotations on request; and (iii) is ready, willing and able to effect transactions in reasonable quantities at its quoted prices with other brokers or dealers.

14.     BMIS was a self-clearing broker, meaning that it itself held title to shares of stock it purchased as opposed to using a primary broker to hold its stock certificates.   As a self-clearing

4

broker, BMIS was able to execute trades with institutional counter-parties. For the most part, those trades were cleared through the National Securities Clearing Corporation ("NSCC").[1]

15.     BMIS engaged in the market making business and actively traded with various institutional counter-parties, including Bear Stearns & Co. ("Bear Stearns"). Madoff was close friends with Aldo Parcesepe, a senior managing director and the head of Over-the-Counter and NASDAQ market maker trading at Bear Stearns. Parcesepe's trading desk regularly traded with BMIS. Between approximately 2005 and October 2008, Parcesepe served on the Board of the National Stock Exchange, Inc. ("NSX") an electronic stock exchange for equities, futures, options and foreign exchanges. Peter Madoff, Madoff's brother and BMIS' chief compliance officer, served together with Parcesepe on NSX's board. Madoff, either directly or through BMIS, owned 10% of NSX. Upon information and belief, BMIS' and Bear Stearns' market making business regularly traded through NSX.

16.     Under Parcesepe's guidance, Bear Stearns built a close business relationship with Madoff. Brokers who traded at Bear Stearns used the firm's automated equity order system to buy and sell stocks. The broker entered the stock symbol and the amount of shares he wanted to trade and the system was supposed to find the best counterparty trade from among the many market maker broker-dealers that traded with Bear Stearns. However, for every trade for a NASDAQ stock, the system automatically defaulted to BMIS as the market maker. This was an unusual accommodation, and upon information and belief Madoff paid Bear Stearns substantial fees for the default placement on the equity order system.

---

[1]     When two parties trade stock, a middleman assists by insuring that the money for the sale is properly exchanged and the new stock ownership is properly recorded within three business days. This is called "clearing" a trade. NSCC, a subsidiary of The Depository Trust & Clearing Corporation, is one of the leading clearing houses for North American stock trading.

17.     From 2000 to 2008, Bear Stearns' approximately 400 brokers and traders all used this same system and all their trades defaulted to BMIS for securities listed on the NASDAQ. This provided a huge source of revenue to BMIS, and upon information and belief, Bear Stearns was BMIS' largest counter-party for market making trades. Upon information and belief, this system remained in place at Bear Stearns subsequent to its acquisition by Chase in March 2008, and continued until BMIS' demise on December 11, 2008.

18.     Between 2000 and 2008, BMIS' market making business produced steady revenues of approximately $50 million a year. Over 25 traders worked for the market making operations on the 19th Floor of BMIS' offices. The business had sufficient capital to support its trading activity and banked at the Bank of New York. Although, upon information and belief, the BMIS market making traders were unaware of Madoff's Ponzi scheme, they were unwittingly used by Madoff to support his criminal enterprise. As explained below, Madoff used the legitimate market making trading volume to disguise the lack of any trading on behalf of Madoff's investment advisor "clients."

19.     Further, the market making business was often the backdrop to meetings Madoff held with potential victims. From his conference room on the 19th Floor, Madoff met with potential "investors" and established "customers" who would view the activity on the trading floor and gain confidence that Madoff's operations were legitimate and could support the steady positive returns he reported.

20.     In addition to market making, BMIS purported to provide investment advisory services. However, BMIS' investment advisory business was entirely fictional and a fraud from its inception. Madoff's fraud victimized "investors" throughout the United States of billions of dollars. Madoff conducted his criminal enterprise, in violation of RICO, through a multi-year

pattern of racketeering activity, including but not limited to thousands of acts of mail and wire fraud.

21.     Starting as early as 1992 and continuing until December 11, 2008, Madoff solicited cash from individuals, businesses, not-for-profit corporations and pension plans which Madoff promised to invest on account for each particular customer.  Madoff explained to his victims that he had a proprietary trading strategy which consisted of the purchase of a basket of approximately 35-50 common stocks within the Standard & Poor's 100 Index while hedging against the movement of these stocks through the purchase and sale of option contracts.

22.     Madoff promised his investors a steady return of up to 10-12% a year, and bragged that he never had a losing quarter.

23.     Madoff purported to keep meticulous records of his victims' fictional investments.  Every month, each victim would receive a detailed account statement showing the victims' supposed stock and option trades during the month together with a summary of the annual return on his or her "investment."  Madoff employed over a dozen people who assisted him in creating these statements and in dealing with customer cash deposits and withdrawals. Frank DePasquale was one of Madoff's long-time employees who had regular contact with investors concerning their BMIS accounts and who knowingly assisted Madoff in creating the false monthly account statements.  All of this work was generated from the 17th floor at BMIS' Manhattan offices.

### Chase's Close Relationship with Madoff

24.     Madoff cultivated a strong business relationship with Chase and, from at least 1992, Madoff had all money received in the investment advisory business deposited into accounts he held at Chase Bank in Manhattan and in a Chase Bank branch in Delaware.  As

Madoff's business and reputation grew, and as the scope of his enormous fraud expanded the deposits in the Chase accounts swelled. Upon information and belief, by 2006, Madoff had billions of dollars in cash on deposit in Chase Bank. These were demand deposits, meaning that Chase had full use of the funds until Madoff withdrew them.

25.    Each victim that opened an account with BMIS received an account number. Madoff did not permit any of his victims to transfer securities from another broker to BMIS. Madoff only accepted cash investments which were directed to Account # 140081703 at Chase Bank in Manhattan (the "Chase Account"). The Chase Account belonged to BMIS, although deposits were almost invariably sent to the benefit of "Bernard L. Madoff." BMIS victims deposited cash in two ways, either through wire transfer or by check. Wire transfers were sent directly to the Chase Account with an advice that the funds were to be credited to Bernard L. Madoff for the benefit to the account of a particular victim. Checks were deposited into the Chase Account with the appropriate customer account number indicated on the face of the check. Either way, the fact that the monies were not Madoff's or BMIS' but rather belonged to the victim and were being received by BMIS as a fiduciary was plain on the face of the deposits.

26.    BMIS victims included individuals, trusts, pensions, not-for-profit corporations and IRA custodians. Chase Bank permitted all funds from putative investors to be commingled in a single account and permitted Madoff to withdraw the funds as he saw fit, without limitation.

27.    Upon information and belief, between 2006 and the middle of 2008, the Chase Account had an average balance of several billion dollars. However, as the financial markets began to sharply decline in 2008, the cash balance in the Chase Account began to drop precipitously. From September 2008 until December 11, 2008, the Chase Account balance often dropped to near zero. In November 2008, the balance dropped close to zero several times which

forced Madoff to transfer at least $164 million from MSIL's accounts in London to the Chase Account. For the month of November 2008, $300 million was deposited by victims to the Chase Account and Madoff withdrew $320 million.

## Madoff Withstands Repeated Scrutiny From Regulators

28.    As a broker-dealer registered with the SEC, BMIS was required to file annual reports about the business. Further, as a member of the Financial Industry Regulatory Authority, Inc. ("FINRA"), BMIS was subject to annual audits. The SEC and FINRA audits were quite regular, occurring about once a year. Officials from these organizations visited BMIS' offices and for weeks at a time reviewed BMIS' books and records to verify a variety of compliance issues ranging from whether trades were promptly executed, that stock quotes matched those on public securities markets, and that payments were timely made. Investigators examined BMIS' cash flows, statements from clearing firms that detailed which stocks BMIS bought and sold, trade confirmations from counter-parties, banking records, and compliance with internal controls and security.

29.    The audits were managed by Bernard Madoff and his brother Peter.

30.    In 2006, the SEC spent weeks from May through August, poring over BMIS' trades and account statements. In particular, the SEC wanted to insure that BMIS was not engaged in "front running." Front running is an illegal practice where a broker purchases a stock for a customer but does not immediately deliver the stock to the customer's account. By delaying delivery, the broker may hedge the market at no risk. If the stock price increases, the broker re-sells the stock and never processes the trade for the customer. If the stock price declines, the broker then delivers the stock to the customer at the original purchase price.

31.     The SEC's 2006 investigation of BMIS also focused on BMIS' investment advisory business.   In particular, the SEC criticized Madoff for not registering with the Commission as an investment advisor.   Madoff lied to the SEC, claiming that his investment advisor business only had nine customers and thereby did not meet the threshold for SEC registration.   Nevertheless, the SEC demanded Madoff's registration, and in the Fall of 2006, he complied by registering as an investment advisor.

32.     The SEC's 2006 audit of BMIS failed to uncover any wrongdoing because Madoff was able to substantiate his legitimacy through his market making operations which depended so heavily on business from Bear Stearns.   By placing before SEC investigators reams of information showing legitimate trading activity through the market making division, the SEC did not delve deeper into Madoff's investment advisory business.   Thus, Madoff used the same mirage that duped his victims to evade serious scrutiny from regulatory authorities.

### Chase Learns that Madoff is a Fraud and Withdraws Its Own Capital

33.     In 2006, Chase developed a derivative product specifically for use with Madoff-related investments that was linked to the performance of the funds owned and managed by Fairfield Greenwich Group ("Fairfield"), an asset management business based in Connecticut and run by Walter Noel.

34.     Fairfield was a "feeder fund" that had directed clients to Madoff's investment advisory business since 1995, and received hefty fees.   In 2007, Fairfield reported $250 million in revenue, $160 million of which came from Madoff.

35.     In 2006, Fairfield had approximately $14.5 billion under management. Of that, $7.5 billion were in the Fairfield Sentry fund, the Greenwich Sentry fund and the Greenwich Sentry Partners fund (collectively the "Sentry Fund"). The Sentry Fund invested 95% of its cash

with BMIS. Chase offered investors, predominantly based in Europe, a note that paid three times the earnings of the Sentry Fund and matured in five years (the "Fairfield Notes"). To hedge against its risk, Chase deposited three times the face amount of the notes directly into the Sentry Fund. This way, if the Sentry Fund did well, Chase's returns would offset its obligations on the notes.

36.     By the summer of 2008, Chase had deposited $250 million with the Sentry Fund. By that time, the financial meltdown on Wall Street and around the world was in full swing. Most investment funds were down almost 30%, yet the Sentry Fund reported gains of 5%, due to the returns Madoff was showing on the money invested with BMIS. Chase, however, began to grow suspicious of Madoff's results and embarked on a due diligence investigation of Madoff's operations.

37.     Upon information and belief, as part of its due diligence and according to standard industry practice, Chase representatives met with Madoff to discuss his operations. They inquired about his cash flow, what percentage of his portfolio was leveraged and with whom he traded option contracts. Based on Madoff's claim to be invested almost entirely in S&P 100 stocks while hedging with options, it was not plausible to Chase that Madoff could be generating substantial positive returns at a time when the S&P was down 30% and option liquidity was limited. However, as he did with all investors, Madoff would not disclose core information that fund managers typically discussed, such as percentages held in cash, and the amount of money borrowed against equity, or leveraged, in the account, and who were his option counter-parties.

38.     Upon information and belief, the Chase due diligence investigative team, which was comprised of managers from the London office and their colleagues in New York, also had access to Mr. Parcesepe's trading desk and to the people who regularly traded with Madoff. The

Chase investigative team, upon information and belief, also consulted with traders to determine the number of trades executed by Chase through Madoff's market making business. They learned that Madoff's trading volume with Bear Stearns (by then part of Chase), Madoff's largest counter-party, could not possibly sustain a portfolio which was supposedly returning 10-12% a year on what Chase knew had to exceed at least $7 billion in customer capital contributions.

39.    The Chase team also had access to Madoff's account records at Chase Bank. Those accounts showed consistent huge cash positions until the middle of 2008 when the market began its downward freefall. Upon information and belief, the Chase investigative team accessed and reviewed Madoff's Chase account records.

40.    As a result of its investigation, in or about September 2008, Chase quietly liquidated its entire $250 million cash position in the Sentry Fund while remaining liable on the Fairfield Notes, even though at the time, Chase's investment was showing a positive 5% return. Notably, Chase did not withdraw its cash from other funds that were linked to derivative notes similar to the Fairfield Notes but not ultimately invested with Madoff. Chase had unequivocally concluded that Madoff's reported returns were false and illegitimate and that the only way to protect its own capital – even in the face of the loss it could incur on the Fairfield Notes – was to liquidate the entirety of its Madoff-related investments. In short, by September 2008, Chase knew that Madoff's business was a fraud. Indeed, in January 2009, Chase publicly admitted that the withdrawal of its investment was based on concerns and questions raised during the due diligence investigation of Madoff.

41.    By September 2008, Chase not only knew that BMIS' reported earnings were false, but by virtue of the nature and volume of activity in the Chase Account, Chase knew that Madoff was diverting customer funds. Yet, Chase continued to trade with Madoff's market

making business and continued to provide Madoff with banking services. Madoff's account at Chase was very lucrative, having provided Chase for years with substantial earnings and fees from the large cash balances in the account. Rather than protect other victims of Madoff's fraud as it had already protected itself, Chase chose not only to protect Madoff, but to partner with him in the fleecing of his victims, by providing exactly the same range of services, for substantial fees, after learning of his criminal enterprise, as it had before its investigation.

42.     Thus, despite being armed with the knowledge that BMIS' business was a fraud and that its purported investors were in fact crime victims, Chase knowingly participated in Madoff's continuing scheme to defraud investors. Chase did this in at least two ways. First, by continuing to do business with BMIS' market making business, Chase provided BMIS with the volume of trading necessary to create the illusion that BMIS' investment advisory business was generating a trading volume consistent with having $7.2 billion under management. Further, Chase continued to provide Madoff with banking services by accepting wired funds and distributing the cash per Madoff's instruction, thereby facilitating Madoff's fraudulent enterprise which continued to lure additional victim contributions, including those of the plaintiff. Indeed, throughout the fall of 2008, Chase continued to work in partnership with Madoff despite being privy to information that the fraud was collapsing and therefore consuming more and more of the victim proceeds stashed in the Chase account.

### Plaintiff Deposits $12.8 Million in the Chase Account

43.     During the summer of 2008, MLSMK received from BMIS monthly statements through the mail for account activity for June, July, August and September. These monthly account statements indicated the trades in securities Madoff supposedly made for each month on behalf of MLSMK's account and the year-to-date earnings which consistently showed a 10-12%

annualized return. Based on these statements, and after Chase had discovered Madoff's fraud and decided to continue its lucrative relationship with him, between October 6, 2008 and December 5, 2008, MLSMK deposited $12.8 million in the Chase Account for credit to its customer account at BMIS.

## Madoff's Fraud is Publicly Exposed

44.     On December 11, 2008, Madoff was arrested by the FBI and charged with securities fraud. On the same date, the SEC obtained a temporary restraining order from this Court (Stanton, J.) freezing all the assets belonging to Madoff and BMIS. The Securities Investor Protection Corporation ("SIPC") intervened in the SEC's civil action and moved to place BMIS into liquidation pursuant to the Securities Investor Protection Act ("SIPA"). On December 15, 2008, the Court ordered BMIS to be liquidated pursuant to SIPA and transferred the case to the Bankruptcy Court (Lifland, J.).

45.     On March 12, 2009, Bernard Madoff pleaded guilty to an 11-count criminal information filed by the United States Attorney for the Southern District of New York admitting that BMIS' investment advisory business was a Ponzi scheme (the "Information"). According to the Information, by 2008, Madoff had 4,800 customer accounts and by November 30, 2008, BMIS's customer monthly statements showed an aggregate of $64 billion under management. Plaintiff's BMIS account was one of the 4,800 referred to in the Information. However, Madoff never traded a single security on behalf of any customer. He merely took money from victims which he parked at Chase Bank until he had to provide earlier investors with cash redemptions. Madoff had also diverted vast sums to himself and his family.

46.     In his plea allocution, Madoff stated that he began the investment advisory business in 1992 and never executed a single trade on behalf of any client. He admitted that he

deposited all victim cash in an account at Chase Bank and used the funds to pay "returns" to earlier "investors."

47.     Madoff is presently incarcerated and awaiting sentencing which is scheduled for June 16, 2009.

## FIRST CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(d)

48.     Plaintiff repeats all of the preceding Paragraphs.

49.     From 2000 until December 11, 2008, Bernard Madoff, himself, and with the assistance of Frank DePasquale and BMIS, did engage in a pattern of racketeering activity through an enterprise which functioned from offices at 885 Third Avenue, New York, New York and which affected interstate commerce.

50.     The enterprise was comprised of an association in fact of Bernard Madoff individually, and through the association of Bernard Madoff with Frank DePasquale and BMIS which engaged in a Ponzi scheme.  Madoff solicited and accepted cash from individuals, partnerships, corporations, trusts, and pension funds from throughout the United States for the stated purpose of investing in securities in order to provide the "investor" with a profit.  Instead of investing these funds, from at least 2001 through December 11, 2008, Madoff directed all victim funds to be deposited in Chase Bank where they resided until Madoff transferred the funds to pay third parties or misappropriated the funds to himself.

51.     The racketeering acts through which Madoff and BMIS conducted the enterprise's affairs consisted, among other things, of the sending through the United States mail to thousands of Madoff victims each and every month, between at least January 1, 2001 and December 11, 2008, monthly account statements which stated falsely that the victim's money was invested in various securities and that BMIS had transacted various stock and bond transactions on behalf of

15

the victim. The account statements purported to show detailed stock transactions such as the date of the trade, the name of the security, the amount of the trade, and the proceeds credited to the customer's account. Each statement also showed the ostensible year-to-date net earnings in the account

52. The BMIS account statements were intended to cause, and did in fact cause, victims to believe that their money was earning a positive return which in turn caused them to give more money to Madoff. Further, Madoff's consistent "returns" earned him a glowing reputation among his victims who then recommended others to "invest" with Madoff.

53. All of the aforesaid account statements provided by Madoff were false. Madoff never traded a single security for any of his victims. He used cash infusions from one victim to pay off other victims and to fund his luxurious personal lifestyle.

54. The association in fact between Madoff, DePasquale and BMIS was separate from the racketeering activity described above. BMIS engaged in legitimate business activity through its market making operations. It regularly traded securities with legitimate counterparties. Its market making business was adequately capitalized and its trades were financed by funds on deposit at the Bank of New York which were not commingled with the funds deposited in the Chase Account. The traders working for the market making business were unaware of Madoff's Ponzi scheme and did not know that their trading activity was being used by Madoff to hide his lack of trading on behalf of his investment advisory business customers. The false monthly account statements generated by Madoff and sent to investors were not based on the market making trading nor were they prepared or mailed by any of the traders working for the market making business.

55.     Madoff's mailing of account statements to investors was part of a scheme to defraud investors and obtain money or property greater than $1,000 by means of false pretenses, by placing those documents in the United States mail in violation of the federal mail fraud statute, 18 U.S.C. § 1341.

56.     Madoff conducted the affairs of his criminal enterprise, a Ponzi scheme, through a pattern of racketeering that ran from at least January 1, 2001 until December 11, 2008, in violation of 18 U.S.C. § 1962(c).

57.     Madoff's activities affected interstate commerce by defrauding investors of funds that were transferred to the Chase Account in New York from accounts all over the United States, including from Florida.

58.     From at least on or about September 1, 2008 until December 11, 2008, Chase and Chase Bank knowingly and purposely conspired with Madoff and BMIS to violate 18 U.S.C. § 1962(c), and, pursuant to that conspiracy, participated in Madoff's racketeering enterprise.

59.     As described above, Chase managing directors based in London who marketed the Fairfield Notes had conducted an extensive due diligence investigation of Madoff's business operations in July and August 2008 as a result of suspicions concerning the disparity between Madoff's reported returns and the performance of the S&P stock index that supposedly was the core of Madoff's investment strategy.   The executives in London, and upon information and belief, with the assistance and participation of colleagues in New York, communicated with Madoff to understand the method in which he was operating and producing profits based on a basket of S&P 100 stocks when the market was down 30%.   Specifically, upon information and belief, they inquired about BMIS' liquidity, what amount of leverage the firm was taking on, and as to the identity of his counter-parties to option transactions.   However, Madoff would not

disclose this information.  Madoff's refusal to disclose such information to the due diligence team of a large institutional investor raised significant red flags to Chase.

60.     The Chase executives charged with investigating Madoff also consulted, upon information and belief, either with Mr. Parcesepe or those working at his trading desk to determine the volume of business Bear Stearns (now Chase) was conducting with BMIS and concluded that the BMIS market making business could not support Madoff's alleged $7 billion investment advisory operation.

61.     Upon information and belief, these executives also had access to BMIS' account records at Chase Bank which showed unusual activity during the summer of 2008 and low cash balances which was uncharacteristic of Madoff's banking practices with Chase Bank over the prior years.

62.     No later than in or about September 2008, Chase concluded that Madoff's reported earnings from BMIS' investment advisory business were false.

63.     Chase knew that Madoff supplied his investors with monthly statements indicating their stock trading activity and year-to-date earnings.  Chase knew this because, throughout its long and close relationship with Madoff, Chase Bank's Private Client Banking Group frequently lent money to Madoff investors and routinely examined BMIS account statements to assess a borrower's financial status.   By virtue of its investigation into Madoff, Chase knew that these statements contained fictional information.

64.     Thus, by September 2008, based on its thorough investigation, Chase knew that Madoff's monthly account statements were false.  Chase and Chase Bank knew at this time that Madoff was not trading securities in the volume necessary to produce positive earnings on a $7 billion investment portfolio.  Chase knew at the time that market conditions did not generate

sufficient counter-party liquidity to sustain the option trades necessary for Madoff to successfully execute his investment strategy for a $7 billion portfolio. Accordingly, Chase recognized that Madoff's business was fictional and a scam.

65.    Following its discovery that Madoff's enterprise was fraudulent, Chase continued to honor and abide by its agreements with Madoff to provide the very services upon which the survival of Madoff's fraud depended. Specifically, Chase, through Chase Bank, conspired and agreed to participate in Madoff's racketeering enterprise by continuing to permit Madoff victims to deposit cash in the Chase Account and then transferring that money to third parties at Madoff's direction. These deposits were for the most part done by wire transfer with instruction to credit the Chase Account for the benefit of a BMIS customer. Chase and Chase Bank knew at the time that the victims had deposited these funds for investment by BMIS, which Chase knew to be a fraud.

66.    Chase and Chase Bank knew that the Chase Account was BMIS' business operating account which funded Madoff's trading for his investment advisory clients. The deposits to the Chase Account indicated that they were for the benefit of specific BMIS customers and indicated the customer account number on the transfer advice.

67.    Chase and Chase Bank knowingly and purposely conspired to violate 18 U.S.C § 1962(c) by providing Madoff with banking services that were integral to the functioning of the racketeering enterprise, and by engaging in predicate acts, including the transmission of numerous interstate wire communications. Chase and Chase Bank were paid substantial fees and had use of billions of dollars of stolen funds, which were derived entirely from Madoff's racketeering enterprise.

68.     Plaintiff was a victim of Madoff's criminal enterprise after Chase entered into a conspiracy with Madoff and BMIS.  Specifically, during the summer of 2008, MLSMK received from BMIS monthly statements through the mail reflecting alleged account activity for June, July, August and September.  These monthly account statements purported to indicate the trades in securities Madoff made during that month on behalf of MLSMK's account and the year-to-date earnings which showed a 10-12% annualized positive return.  Based on these statements, on or about October 6, 2008, MLSMK caused $1,100,000 to be transferred by interstate wire to the Chase Account for credit to its account at BMIS.  Chase Bank, by way of wire transmission, communicated to BMIS that $1.1 million had been received on behalf of MLSMK.  Shortly after that, MLSMK received in the mail a wire confirmation from BMIS which indicated a credit of $1.1 million to MLSMK's account.

69.     Shortly after MLSMK's deposit of funds in the Chase Account, at Madoff's direction, Chase Bank transferred MLSMK's money over interstate lines to third parties.

70.     On October 31, 2008, based on the Madoff monthly statements showing a consistent profitable return, MLSMK caused $8,478,283.66 to be transferred by interstate wire to the Chase Account for credit to MLSMK's account at BMIS.  Chase Bank, by way of wire transmission, communicated to BMIS that $8,478,283.66 had been received for the benefit of MLSMK.  Shortly after that, MLSMK received in the mail a wire confirmation from BMIS which indicated a credit of $8,478,283.66 to MLSMK's account.

71.     Shortly after MLSMK's deposit of funds in the Chase Account, at Madoff's direction, Chase Bank transferred MLSMK's money over interstate lines to third parties.

72.     In early November, MLSMK received its October statement from BMIS showing continued positive returns on the account.  Based on this statement, on November 6, 2008,

MLSMK caused $500,000 to be transferred by intestate wire to the Chase Account for credit to its account at BMIS. Chase Bank, by way of wire transmission, communicated to BMIS that $500,000 had been received for the benefit of MLSMK. Shortly after that, MLSMK received in the mail a wire confirmation from BMIS which indicated a credit of $500,000 to MLSMK's account.

73. Shortly after MLSMK's deposit of funds in the Chase Account, at Madoff's direction, Chase Bank transferred MLSMK's money over interstate lines to third parties.

74. Based on Madoff's continuing reports of positive returns, on November 15, 2008, MLSMK caused $850,716.46 to be transferred by interstate wire to the Chase Account for credit to its account at BMIS. Chase Bank, by way of wire transmission, communicated to BMIS that $850,716.46 had been received for the benefit of MLSMK. Shortly after that, MLSMK received in the mail a confirmation from BMIS which indicated a credit of $850,716.46 to MLSMK's account.

75. Shortly after MLSMK's deposit of funds in the Chase Account, at Madoff's direction, Chase Bank transferred MLSMK's money over interstate lines to third parties.

76. Based on Madoff's continuing reports of positive returns, on November 21, 2008, MLSMK caused $946,813.80 to be transferred by interstate wire to the Chase Account for credit to its account at BMIS. Chase Bank, by way of wire transmission, communicated to BMIS that $946,813.80 had been received for the benefit of MLSMK. Shortly after that, MLSMK received in the mail a confirmation from BMIS which indicated a credit of $946,813.80 to MLSMK's account.

77. Shortly after MLSMK's deposit of funds in the Chase Account, at Madoff's direction, Chase Bank transferred MLSMK's money over interstate lines to third parties.

78.     In early December 2008, MLSMK received its November account statement from BMIS which showed continued positive returns. Based on that statement, on December 5, 2008, MLSMK caused $950,000 to be transferred by interstate wire to the Chase Account for credit to its account at BMIS. Chase Bank, by way of wire transmission, communicated to BMIS that $950,000 had been received for the benefit of MLSMK. Shortly after that, MLSMK received in the mail a confirmation from BMIS which indicated a credit of $950,000 to MLSMK's account.

79.     Chase Bank's use of the wires to inform Madoff of receipt of MLSMK's funds and the transfer by wire of those funds out of the Chase Account over interstate lines and to third parties throughout the United States were predicate acts committed in furtherance of Madoff's racketeering enterprise in violation of 18 U.S.C. § 1343.

80.     Madoff could not obtain customer funds or use them to execute his Ponzi scheme without the aforesaid acts by Chase Bank. Madoff had no ability to accept wire or check transfers and could not receive or move money without the direct involvement and assistance of Chase Bank. These acts by Chase Bank permitted Madoff to steal MLSMK's funds to MLSMK's detriment.

81.     Chase further knowingly and purposely conspired and agreed to violate 18 U.S.C. § 1962(c), by continuing to actively trade with BMIS, using interstate wire communications, through the Bear Stearns trading desk headed by Aldo Parcesepe which Chase acquired in March 2008.

82.     Bear Stearns was BMIS' largest source of market making business. By September 2008, Chase, however, knew that Madoff was committing fraud and that his stated earnings were false. Yet, Chase continued to trade with BMIS which permitted BMIS to

continue to generate huge trading volumes which Madoff used to legitimize his operations to SEC and FINRA regulators and to both new and established victims.

83.     Between September and December 2008, victims visited Madoff at his New York offices and observed the bevy of activity on the trading floor by BMIS' market making group. This permitted Madoff to convince new victims to deposit money in the Chase Account and assured established victims that their funds were being actively managed.   Without this substantial trading volume, Madoff could not have continued to operate his Ponzi scheme because it either would have been uncovered by regulators, or investors would not have been able to verify for themselves that his operations were actual and substantial and therefore would not have invested.

84.     Every day that trading was open on the U.S. financial markets between September 1, 2008 and December 11, 2008, Chase executed, upon information and belief, thousands of trades with BMIS.  Each trade involved the transmission of trading information by electronic means between Chase and BMIS, and upon information and belief, was conducted by Bear Stearns traders from locations throughout the United States and crossed state lines.  Each of the foregoing wire transmissions were done in furtherance of a scheme to defraud BMIS victims in violation of 18 U.S.C. § 1343.

85.     Plaintiff has been damaged by the aforesaid acts in an amount to be determined at trial but not less than $12.8 million.

**SECOND CLAIM FOR RELIEF**
**(Aiding and Abetting Breach of Fiduciary Duty)**

86.     Plaintiff repeats all of the preceding Paragraphs.

87. As set forth above, by September 1, 2008, Chase and Chase Bank knew that Madoff's reported earnings from his investment advisory business were false and therefore that he was engaged in a criminal enterprise.

88. Chase and Chase Bank knew that the plaintiff was a customer of BMIS and had an account there. Every transfer of funds caused by MLSMK to the Chase Account stated that it was for the benefit of MLSMK.

89. Chase and Chase Bank knew that the Chase Account was exclusively the repository of monies deposited by investor clients of BMIS.

90. Chase and Chase Bank knew that Madoff was the sole owner of BMIS and, as a broker-dealer, owed a fiduciary duty to the plaintiff.

91. Madoff breached his fiduciary duty to the plaintiff by failing to use its funds for investment purposes and instead misappropriating the funds for his own benefit, including through the operation of a Ponzi scheme.

92. Madoff was able to perpetrate this scheme by sending his victims monthly account statements and trade confirmations which stated falsely that securities were being purchased and sold on behalf of the plaintiff.

93. Chase and Chase Bank provided substantial assistance to Madoff by providing him with banking services which accomplished illegal and fraudulent conveyances by Madoff to himself and to third parties.

94. Chase also provided Madoff with substantial assistance by continuing to function as BMIS' largest market maker counterparty which provided Madoff with the volume of trades needed to satisfy potential audits by financial regulators and which permitted the market making

group to continue to function and thereby enabling Madoff to provide victims with the appearance that BMIS engaged in substantial securities trading.

95.     Madoff could not have converted the funds entrusted to him by the plaintiff without the substantial assistance of Chase and Chase Bank because BMIS was not a banking institution and could not accept or process wires or check deposits.   Plaintiff's injury was proximately caused by Chase and Chase Bank.

96.     Plaintiff has been damaged in an amount to be determined at trial but not less than $12.8 million.

97.     The aforesaid conduct by Chase and Chase Bank was purposeful and contumacious.  Even though Chase and Chase Bank knew they were aiding and abetting a breach of fiduciary duty, they continued to do so in order to preserve their valuable banking and trading relationship with Madoff which provided them with substantial revenues and balance sheet assets.   Accordingly, punitive damages should be awarded to plaintiff in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
#### (Commercial Bad Faith)

98.     Plaintiff repeats all of the preceding Paragraphs.

99.     As set forth above, Madoff and BMIS engaged in a scheme to steal money from victims by persuading them to send money to the Chase Account on the pretext that it would be invested by BMIS in securities and generate steady, positive returns under Madoff's management.

100.    Chase Bank accepted deposits into the Chase Account by both check and wire throughout its multi-year relationship with Madoff.

101.    Based on its familiarity with Madoff and BMIS' business, as well as from the face of the deposits which invariably indicated that they were for the benefit of investment accounts held in the victim-depositor's name with BMIS, Chase and Chase Bank had knowledge of the purported nature of the Chase Account and the intended purpose of the deposits. That is, Chase and Chase bank knew that the Chase Account was a repository of "investor" funds with respect to which Madoff was a fiduciary.

102.    Chase and Chase Bank permitted Madoff to dispose of the funds in any manner and, to this end, routinely effected wire transfers out of the Chase Account to third parties at Madoff's direction.

103.    Prior to approximately September 1, 2008, Chase and Chase Bank apparently accepted these deposits and executed withdrawals at Madoff's direction in the belief that BMIS' business was legitimate.

104.    As set forth in detail above, however, during the summer of 2008 Chase conducted a detailed investigation of Madoff that led it to discover that Madoff was lying about his investment returns and issuing false account statements.   Chase and Chase Bank thus obtained actual knowledge of Madoff's wrongdoing.

105.    As a result of its actual knowledge of Madoff's scheme, Chase and Chase Bank's continued acceptance of hundreds of millions of victim dollars into the Chase Account, and Chase Bank's continued dispersion of those victim funds at Madoff's direction, after on or about September 1, 2008, were made in bad faith.

106.    Specifically, Chase Bank's acceptance of Plaintiff's deposits of approximately $12.8 million into the Chase Account between October 6, 2008 and December 5, 2008, was done in bad faith in light of Chase and Chase Bank's knowledge of Madoff's fraud.

107.   Similarly, Chase Bank's dispersal of Plaintiff's money out of the Chase Account at Madoff's direction was done in bad faith in light of Chase and Chase Bank's knowledge of Madoff's fraud.

108.   Through their knowledge of Madoff's unlawful conduct, Chase and Chase Bank thereby themselves became participants in the underlying scheme to steal money from Madoff's victims.

109.   Plaintiff has been damaged by defendants' bad faith conduct in an amount to be determined at trial but not less than $12.8 million.

110.   The aforesaid conduct by Chase and Chase Bank was purposeful and contumacious.  Even though Chase and Chase Bank knew they were facilitating Madoff's fraud, they continued to do so in order to preserve their valuable banking and trading relationship with Madoff which provided them with substantial revenues and balance sheet assets.  Accordingly, punitive damages should be awarded to plaintiff in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF
#### (Negligence)

111.   Plaintiff repeats all of the preceding Paragraphs.

112.   Chase and Chase Bank provided banking services to Madoff and BMIS since 1992.

113.   By the end of 2007, upon information and belief, Madoff had several billion dollars in the Chase Account.

114.   Chase and Chase Bank knew that Madoff directed his victims to deposit funds in the Chase Account and that the purpose of these deposits was to fund Madoff's investment activity on behalf of these customers.

115.    The wire transfer advices from Madoff's customers to the Chase Account indicated that the wired funds were for the benefit of the particular customer's account and were for the purpose of investing in BMIS.

116.    Based on its familiarity with Madoff and BMIS' business, as well as from the face of the deposits which invariably indicated that they were for the benefit of investment accounts held in the victim-depositor's name with BMIS, Chase had knowledge of the purported nature of the Chase Account and the intended purpose of the deposits. That is, Chase knew that the Chase Account was a repository of "investor" funds with respect to which Madoff was a fiduciary.

117.    Beginning in 2006, in connection with its issuance of the Fairfield Notes, Chase had become an investor in Madoff through its investment of $250 million in the Sentry Fund. During the summer of 2008, Chase recognized certain red flags – including the fact that BMIS' reported returns on investment based on its publicly stated strategy were apparently inconsistent with market conditions at the time – and decided to conduct a due diligence investigation. As a result of that investigation, Chase learned that Madoff was engaged in a massive fraud by lying to investors about the returns he was reporting in his investment advisory business.

118.    As a result of its knowledge that Madoff was engaged in fraud with respect to victim funds on deposit in the Chase Account, for which Madoff was a fiduciary, Chase and Chase Bank became duty-bound to protect the depositors from Madoff's malfeasance.

119.    Chase and Chase Bank breached this duty by failing to take any action following its investigation of Madoff other than the withdrawal of its own assets from Madoff-related investment vehicles. It continued to service the Chase Account, accepting new deposits and disposing of the contents of the Chase Account as directed by Madoff from September 1, 2008 through December 11, 2008.

120.    Chase and Chase Bank's breach of their duty of care caused plaintiff to suffer damages by permitting Madoff to convert its funds for his own use.  But for Chase and Chase Bank's breach, Madoff would have been unable to obtain and convert plaintiff's funds.

121.    Plaintiff has been damaged in an amount to be determined at trial, but not less than $12.8 million.

122.    The aforesaid conduct by Chase and Chase Bank was purposeful and contumacious.  Even though Chase and Chase Bank knew they were facilitating Madoff's fraud, they continued to do so in order to preserve their valuable banking and trading relationship with Madoff which provided them with substantial revenues and balance sheet assets.  Accordingly, punitive damages should be awarded to plaintiff in an amount to be determined at trial.

### FIFTH CLAIM FOR RELIEF
### (Negligence)

123.    Plaintiff repeats all of the preceding Paragraphs.

124.    Chase and Chase Bank provided banking services to Madoff and BMIS since 1992.

125.    By the end of 2007, upon information and belief, Madoff had several billion dollars in the Chase Account.

126.    Chase and Chase Bank knew that Madoff directed his victims to deposit funds in the Chase Account and that the purpose of these deposits were to fund Madoff's investment activity on behalf of these customers.

127.    The wire transfer advices from Madoff's customers to the Chase Account indicated that the wired funds were for the benefit of the particular customer's account and were for the purpose of investing in BMIS.

128.    Based on its familiarity with Madoff and BMIS' business, as well as from the face of the deposits which invariably indicated that they were for the benefit of investment accounts held in the victim-depositor's name with BMIS, Chase and Chase Bank had knowledge of the purported nature of the Chase Account and the intended purpose of the deposits. That is, Chase and Chase Bank knew that the Chase Account was a repository of "investor" funds with respect to which Madoff was a fiduciary.

129.    Between September 1, 2008 and December 11, 2008, the activity in the Chase Account was extremely volatile and erratic and did not comport with the banking patterns Madoff had demonstrated for the prior decade. Upon information and belief, in September and October, 2008, hundred of millions of dollars were withdrawn from the Chase Account. In November 2008, the balance reached near zero requiring Madoff to transfer $164 million from MLIS in London to the Chase Account. In November $300 million was transferred into the Chase Account and $320 million was transferred out to third parties.

130.    Even without Chase's discovery of Madoff's fraud through its detailed due diligence investigation in the summer of 2008, the erratic signs of withdrawal activity and transfers of money from overseas imposed a duty on Chase and Chase Bank to investigate Madoff to ensure that Madoff was not diverting fiduciary funds and to take appropriate action based upon that investigation, including to shut down the Chase Account. Chase and Chase Bank breached that duty by taking no action whatsoever despite the gathering storm of warning signs in the Chase Account.

131.    Chase and Chase's Bank breach of their duty of care caused plaintiff to suffer damages by permitting Madoff to convert the funds MLSMK deposited between October 6, 2008 and December 5, 2008, for his own use.

132.   Plaintiff has been damaged in an amount to be determined at trial, but not less than $12.8 million.

133.   The aforesaid conduct by Chase and Chase Bank was purposeful and contumacious. Even though Chase and Chase Bank knew they were facilitating Madoff's fraud, they continued to do so in order to preserve their valuable banking and trading relationship with Madoff which provided them with substantial revenues and balance sheet assets. Accordingly, punitive damages should be awarded to plaintiff in an amount to be determined at trial.

WHEREFORE, plaintiff demands judgment against Chase and Chase Bank, jointly and severally, as follows:

a.      On the First Claim for Relief, damages in an amount to be determined at trial but not less than $12.8 million, plus treble damages and costs and attorneys' fees pursuant to 18 U.S.C. § 1964;

b.      On the Second Claim for Relief, damages in an amount to be determined at trial but not less than $12.8 million, plus punitive damages in an amount to be determined at trial;

c.      On the Third Claim for Relief, damages in an amount to be determined at trial but not less than $12.8 million, plus punitive damages in an amount to be determined at trial;

d.      On the Fourth Claim for Relief, damages in an amount to be determined at trial but not less than $12.8 million, plus punitive damages in an amount to be determined at trial;

e.      On the Fifth Claim for Relief, damages in an amount to be determined at trial but not less than $12.8 million, plus punitive damages in an amount to be determined at trial; and

f.      For whatever further relief this Court deems necessary and proper.


Plaintiff demands a trial by jury.


Dated:  New York, New York
        April 23, 2009

_____
Howard Kleinhendler (HK 5712)
Julian D. Schreibman  (JS 1124)
Sara G. Spiegelman (SS 4352)
WACHTEL & MASYR, LLP
110 East 59th Street
New York, New York 10022
(212) 909-9500
*Attorneys for Plaintiff*
*MLSMK Investments Company*