```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/15/10
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
                                         :
MLSMK INVESTMENTS COMPANY,               :
                                         :
                    Plaintiff,           :
                                         :  09 Civ. 4049 (BSJ)
          v.                             :     **Order**
                                         :
JP MORGAN CHASE & CO.,                   :
JP MORGAN CHASE BANK, NA,                :
                                         :
                    Defendants.          :
----------------------------------------x

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

Plaintiff MSMLK Investments Company ("Plaintiff") filed the
above-captioned action on April 23, 2009 against Defendants JP
Morgan Chase & Co. ("Defendant JPMC") and JP Morgan Chase Bank,
NA ("Defendant Chase Bank," and together with Defendant JPMC,
"Defendants").  Defendants now move to dismiss all claims on the
grounds that Plaintiff has failed to state a claim upon which
relief may be granted.  See Fed. R. Civ. P. 12(b)(6).  For the
reasons stated below, Defendants' Motion to Dismiss is GRANTED
in its entirety.

### BACKGROUND[1]

This case stems from the now-notorious Ponzi scheme
perpetrated by Bernard Madoff ("Madoff").  Plaintiff was an

---

[1]    All facts are drawn from the allegations in the Complaint.  They are
assumed to be true only for the purposes of the instant Motion to
Dismiss.

investor in Bernard L. Madoff Investment Services LLC ("BMIS"),
Madoff's investment advisory business.   (Compl. ¶ 1.)

Defendant JMPC is a financial services firm.   Plaintiff
alleges that, in 2006, Defendant JPMC "developed a derivative
product specifically for use with Madoff-related investments
that was linked to the performance of the funds owned and
managed by Fairfield Greenwich Group."   (Compl. ¶ 33.)
Plaintiff further states that, in March 2008, Defendant JMPC
acquired Bear Sterns & Co. ("Bear Sterns"), an investment bank
that actively traded with BMIS' legitimate market-making
business.   (Id. ¶¶ 18, 19, 54.)   After absorbing Bear Sterns's
business, Defendant JPMC continued to do business with BMIS.
(See id. 38.)

Madoff held an account registered to BMIS at Defendant
Chase Bank (the "Chase Account") for at least sixteen years.
(See Compl. ¶ 24.)   From at least 1992 onwards, Madoff had all
money received in the investment advisory business deposited
into the Chase Account.   (Id.)

Plaintiff alleges that, during the summer of 2008,
Defendant JPMC became suspicious of the unusually high returns
on funds linked to the Madoff investments and met with Madoff to
discuss his operations.   (Compl. ¶¶ 36-37; 59.)   Plaintiff
states that Madoff did not admit any illegal activity to
representatives of Defendant JPMC at this alleged meeting.   (Id.

2

¶ 37.)  However, Plaintiff claims that, following the alleged meeting, Defendant JPMC undertook its own investigation of Madoff, "consult[ing] with traders to determine the number of trades executed by [Defendant JPMC] through Madoff's market making business" (id. ¶ 38) and also "access[ing] and review[ing] Madoff's . . . account records" at Defendant Chase Bank (id. ¶ 39).

Plaintiff states that Defendant JPMC eventually "unequivocally concluded that Madoff's reported returns were false and illegitimate." (Compl. ¶ 40.)  Plaintiff further states that, based on Defendant JPMC's conclusion that Madoff's returns were false, "in or about September 2008, [Defendant JPMC] quietly liquidated its entire $250 million cash position in [the Madoff-linked fund] . . . even though at the time, [the] investment was showing a positive 5% return." (Id.)

Plaintiff alleges that, after determining that Madoff was committing fraud, Defendants decided to "partner with him in the fleecing of his victims." (Compl. ¶ 41.)  Plaintiff claims that Defendants "knowingly participated in Madoff's continuing scheme to defraud investors" (id. ¶ 42) by "continu[ing] to trade with Madoff's market making business and continu[ing] to provide Madoff with banking services" (id. ¶ 41) after becoming aware of his fraud.

Between October and December 2008, Plaintiff deposited $12.8 million in the Chase Account.  (Id.)  Plaintiff expected its funds to be used by Madoff to purchase and sell securities.  (Id.)  However, Madoff never invested Plaintiff's money and instead misappropriated its funds.  (Id.)  Plaintiff alleges that "[b]ut for [Defendants'] actions . . . [P]laintiff would not have lost [the] $12.8 million" invested with Madoff.  (Id. ¶ 2.)

On April 23, 2009, Plaintiff filed the instant action in the United States District Court for the Southern District of New York alleging violations of 18 U.S.C. § 1962(d) ("RICO"), aiding and abetting breach of fiduciary duty, commercial bad faith, and two counts of negligence.  Defendants now move to dismiss the Complaint in its entirety.

## LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint that fails to state a claim upon which relief may be granted.  "In ruling on a motion to dismiss for failure to state a claim upon which relief may be granted, the court is required to accept the material facts alleged in the complaint as true."  Frasier v. Gen. Elec. Co., 930 F.2d 1004, 1007 (2d Cir. 1991).  The court is also required to read a complaint generously, drawing all reasonable inferences from its allegations in favor of the plaintiff.  See

<u>California Motor Transp. Co. v. Trucking Unlimited</u>, 404 U.S. 508, 515 (1972).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (internal quotations omitted). Instead, a plaintiff must assert "enough facts to state a claim to relief that is plausible on its face." <u>Id.</u> at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. __, 129 S. Ct. 1937, 1940 (2009).

**DISCUSSION**

I.   <u>Plaintiff Has Failed to State a RICO Conspiracy Claim Under</u>
<u>18 U.S.C. § 1962(d)</u>

Section 1962 of RICO prohibits (a) the use of income "derived ... from a pattern of racketeering activity" to acquire an interest in, establish, or operate an enterprise engaged in or affecting interstate commerce; (b) the acquisition of any interest in or control of such an enterprise "through a pattern of racketeering activity"; (c) the conduct or participation in

5

the conduct of such an enterprise's affairs "through a pattern

of racketeering activity;" and (d) conspiring to violate any of

the provisions of subsection (a), (b), or (c). GICC Capital

Corp. v. Tech. Fin. Group, Inc., 67 F.3d 463, 465 (2d Cir.

1995). To allege a violation of Section 1962(d), Plaintiff must

"allege that the defendants agreed to commit at least two

predicate acts in furtherance of a pattern of racketeering

activity, and that these agreed-upon acts, if carried out, would

have formed a pattern of racketeering activity." Jordan

(Bermuda) Inv. Co. v. Hunter Green Inv. Ltd., 154 F. Supp. 2d

682, 695 (S.D.N.Y. 2001) (internal quotation omitted). "If a

party intends to allege that communications constitute predicate

acts of mail or wire fraud, it must allege the following

elements of those offenses: (1) the existence of a scheme to

defraud, (2) defendants' knowing participation in such a scheme,

and (3) the use of wire or mail communications in interstate

commerce in furtherance of that scheme." Ebusinessware, Inc. v.

Tech. Servs. Group Wealth Mgmt. Solutions, LLC, No. 08 Civ.

9101, 2009 WL 5179535, at *16 (S.D.N.Y. Dec. 29, 2009) (citing

Chanayil v. Gulati, 169 F.3d 168, 170-71 (2d Cir. 1999)).

   "[I]n order to state a civil RICO claim grounded in fraud,

[a] plaintiff must meet [the] heightened pleading standard" of

Federal Rule of Civil Procedure 9(b). Zhu v. First Atlantic

Bank, 2005 WL 2757536, at *4 (S.D.N.Y. Oct. 25, 2005); see Fed.

R. Civ. P. 9(b). Accordingly, "[i]n addition to alleging the particular details of a fraud, . . . plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 179 (2d Cir. 2004). "The requisite 'strong inference' of fraud may be established either (1) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (2) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290-91 (2d Cir. 2006) (internal quotation omitted). Plaintiffs may not "base claims of fraud on speculation and conclusory allegations." Lerner, 459 F.3d at 290-91 (internal quotation omitted).

In the instant case, Plaintiff alleges that Defendants knowingly and purposely conspired to violate 18 U.S.C. § 1962(c) by providing Madoff with banking services integral to the functioning of his racketeering enterprise. (See Compl. ¶ 67.) Specifically, Plaintiff claims that after Defendants learned in or about September 2008 that Madoff was committing fraud, (see id. ¶ 41,) Defendants participated in Madoff's racketeering enterprise by permitting Plaintiff to deposit money in the Chase Account and by then transferring that money to third parties at Madoff's direction (id. ¶¶ 65, 68.) Plaintiff states that

Defendant Chase Bank's "use of the wires to inform Madoff of receipt of [Plaintiff's] funds and the transfer by wire of those funds out of the Chase Account over interstate lines . . . were predicate acts committed in furtherance of Madoff's racketeering enterprise."  (Id. ¶ 79.)

Plaintiff further claims that Defendant JPMC conspired to violate 18 U.S.C. § 1962(d) insofar as Defendant JPMC nonetheless continued to trade with BMIS even after learning that Madoff was committing fraud, thus allowing BMIS to "generate huge trading volumes which Madoff used to legitimize his operations to . . . regulators and to both new and established victims."  (Id. ¶ 81, 82.)  Plaintiff states that "[w]ithout this substantial trading volume, Madoff could not have continued to operate his Ponzi scheme."  (Id. ¶ 83.)

Defendants move to dismiss Plaintiff's RICO claims, arguing that (1) the civil RICO conspiracy claim is precluded by the Private Securities Litigation Reform Act of 1995, 18 U.S.C. § 1964(c) (the "PSLRA"); (2) Plaintiff fails to plead that either of Defendants possessed the requisite scienter; (3) Plaintiff fails to plead that Defendants entered into any agreement with a RICO enterprise; and (4) the acts that Defendants are alleged to have committed were not RICO predicate acts committed as part of a pattern of racketeering activity.  The Court agrees that

Plaintiff has failed to plead the requisite scienter, and thus dismisses on that basis.

1.  Plaintiff Does Not Allege Sufficient Facts to Show that Defendants Had Motive to Commit Fraud

In order to sufficiently plead motive to commit fraud, a complaint must indicate the concrete benefits that a defendant could attain through the alleged misstatements or omissions. See Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001) (stating that allegations must "entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged"). Where plaintiffs' motive allegations are too generalized, they cannot demonstrate "defendants' concrete and personal benefit from the alleged fraud." Id. at 140.

In the instant case, Plaintiff alleges that Defendants were motivated to participate in fraudulent activity because "Madoff's account at [Defendant Chase Bank] was very lucrative, having provided [Defendant Chase Bank] with substantial earnings and fees from the large cash balances in the account." (Id. ¶ 41.) In support, Plaintiff states only that Defendants "were paid substantial fees and had use of billions of dollars of stolen funds, which were derived entirely from Madoff's racketeering enterprise." (id. ¶ 67.)

These allegations cannot support an inference that Defendants had a motive to commit fraud.  In sum and substance, Plaintiff claims that Defendants became involved in Madoff's fraud in order to preserve the fees and deposits they derived from providing general banking services to BMIS.  (See Compl. ¶ 67.)  However, the Second Circuit has repeatedly found that routine benefits derived in the ordinary course of business do not constitute the type of "concrete benefit" necessary to allege fraudulent intent under Rule 9(b).  See Chill v. Gen. Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994); Schmidt v. Fleet Bank, Nos. 96 Civ. 5030, 96 Civ. 7836, 96 Civ. 9705, 96 Civ. 9706, 1998 WL 47827, at *9 (S.D.N.Y. Feb. 4, 1998) (citing cases).  On the contrary, "[t]o allege motive under Rule 9(b), a plaintiff must show a benefit to the defendant going beyond the receipt of normal compensation for professional services rendered.  Friedman v. Arizona World Nurseries, 730 F. Supp. 521, 532 (S.D.N.Y. 1990) (internal quotation omitted); see also Interallianz Bank AG v. Nycal Corp., No. 93 Civ. 5024, 1994 WL 177745, at *7 (S.D.N.Y. May 6, 1994) (dismissing RICO claims against bank where plaintiff failed to allege that the bank "participated in the operation or management [of] either putative enterprise's affairs or engaged in any activities beyond conducting its own banking business by financing

10

transactions and managing customer accounts"). In this case, as in Schmidt, "[t]he fact that [Defendants] stood to gain by having access to additional deposits from . . . investors and by earning fees on . . . transactions does not support an inference of fraudulent intent on the part of the banks. . . . [S]uch generalized motives, which could be imputed to almost any bank, are not sufficiently concrete for purposes of inferring fraudulent intent." Id. at *6.

    2.    Plaintiff Does Not Allege Facts Constituting Strong
Circumstantial Evidence of Conscious Misbehavior or Recklessness

        Plaintiff alleges that, during the summer of 2008,
Defendant JPMC became aware of Madoff's fraud after (1) noticing unusually high returns on Madoff investment-linked funds (see Compl. ¶ 37); (2) figuring out "that the BMIS market making business could not support Madoff's alleged $7 billion investment advisory operation" (id. ¶ 60); and (3) learning that "BMIS' account records at [Defendant] Chase Bank . . . showed unusual activity during the summer of 2008 and low cash balances which was uncharacteristic of Madoff's banking practices with [Defendant] Chase Bank over the prior years" (id. ¶ 61). Plaintiff further alleges that, based on its knowledge of Madoff's fraud, Defendant JMPC liquidated its investment in a Madoff-linked fund (id. ¶ 40) but "continued to trade with Madoff's market making business and continued to provide Madoff

with banking services" (id. ¶ 40).  Plaintiff claims that this combination of events constitutes evidence of conscious misbehavior because "[r]ather than protect other victims of Madoff's fraud as it had already protected itself, [Defendants] chose not only to protect Madoff, but to partner with him in the fleecing of his victims, by providing exactly the same range of services, for substantial fees, after learning of his criminal enterprise, as it had before its investigation."  (Id.)

The facts alleged in the Complaint, however, do not give rise to a strong inference of fraudulent intent.  As courts in this district have repeatedly observed, "parties must present at least a minimal factual basis for their allegations of scienter."  Jeanette Coquette Co. v. Hartford Fire Ins. Co., No. 93 Civ. 4418, 1995 WL 363864, at *3 (S.D.N.Y. June 19, 1995).  Allegations may be made on information and belief when "the facts are peculiarly within the knowledge of the defendants," but it is axiomatic that "the complaint must allege facts demonstrating the basis for the information and belief."  See, e.g., OSRecovery, Inc. v. One Groupe Int'l, Inc., No. 02 Civ. 8993, 2004 WL 238035, at *1 (S.D.N.Y. Feb. 9, 2004).

In this case, Plaintiff does nothing of the sort.  While it may be true that Defendants could have connected the dots to determine that Madoff was committing fraud, Plaintiff offers no facts to support the claim that they actually reached such a

conclusion.  (See, e.g., Compl. ¶ 61 (stating, without factual support, that Defendant JPMC "had access to Madoff's account records at [Defendant] Chase Bank" and thus determined that Madoff's bank balance was fluctuating unusually); Compl. ¶ 37 (stating, again without factual support, that it "was not plausible to [Defendant JPMC] that Madoff could be generating substantial positive returns at a time when the [Standard & Poor's index] was down 30% and option liquidity was limited").) In fact, even Plaintiff's allegation that Defendant JPMC met with Madoff during an investigation of him is based on "experts in the field that said that . . . when a derivatives group does a due diligence investigation, they meet with the principals who run the fund." (Oct. 29, 2009 Tr. 34.) Such speculation does not suffice to state a claim under Section 1962(d).

Accordingly, because Plaintiff has failed to allege facts giving rise to a strong inference of fraudulent intent, Plaintiff has not met the heightened pleading standard of Rule 9(b) and Count One must be DISMISSED.

## II.  Plaintiff Fails to State a Claim for Aiding and Abetting Breach of Fiduciary Duty

To plead a cause of action for aiding and abetting breach of fiduciary duty, a plaintiff must allege both that "the defendant had actual knowledge of the primary violator's status as a fiduciary and actual knowledge that the primary violator's

conduct contravened a fiduciary duty." Kolbeck v. LIT America, Inc., 939 F. Supp. 240, 246-47 (S.D.N.Y. 1996) (internal quotation omitted).  Actual, as opposed to constructive, knowledge is required.  See id. at 246; Musalli Factory For Gold & Jewelry v. JPMorgan Chase Bank, N.A., 261 F.R.D. 13, 23 (S.D.N.Y. 2009) (dismissing aiding and abetting breach of fiduciary duty claim arising from allegations that a bank aided and abetted its customer's misappropriation of funds belonging to plaintiff for failure to plead actual knowledge or substantial assistance).  "Although the particularized pleading standards of Rule 9(b) do not apply to this claim, plaintiff must nonetheless allege some facts, in non-conclusory terms[,] to show knowing participation by defendants in the alleged breach."  Musalli, 261 F.R.D. at 24.

For all the reasons set forth above in Section I, Plaintiff's conclusory allegations of knowledge are insufficient to plead aiding and abetting breach of fiduciary duty.  In fact, Plaintiff has utterly failed to set forth non-conclusory facts indicating even that Defendants had constructive knowledge of Madoff's fraud, let alone actual knowledge.  Accordingly, Plaintiff has failed to plead a claim for aiding and abetting breach of fiduciary duty.

Because Plaintiff has failed to set forth facts to show that Defendants had actual knowledge of Madoff's fraud, Count Two must be DISMISSED.

## III. Plaintiff Fails to State a Claim for Commercial Bad Faith

"[T]o state a claim for commercial bad faith against a bank, a plaintiff must allege: (1) a scheme or acts of wrongdoing; together with either: (2) allegations of the bank's actual knowledge of the scheme or wrongdoing that amounts to bad faith; or (3) allegations of complicity by bank principals in alleged confederation with the wrongdoers." Musalli, 261 F.R.D. at 24 (internal quotation omitted). The New York Court of Appeals has explained that commercial bad faith is alleged when a "bank acts dishonestly—where it has actual knowledge of facts and circumstances that amount to bad faith, thus itself becoming a participant in the fraudulent scheme." Prudential-Bache Sec., Inc. v. Citibank, N.A., 536 N.E.2d 1118, 1125 (1989). "A claim for commercial bad faith is . . . subject to the pleading requirements of Rule 9(b), such that the circumstances of the alleged fraud must be alleged with particularity." Musalli, 261 F.R.D. at 24.

As Judge Marrero observed in Rosner v. Bank of China, "New York courts overwhelmingly recognize that a plaintiff does not satisfy Rule 9(b) by alleging a bank's actual knowledge of a fraud based on allegations of the bank's suspicions or ignorance

15

of obvious 'red flags' or warning signs indicating the fraud's existence." No. 06 Civ. 13562, 2008 WL 5416380 (S.D.N.Y. Dec. 18, 2008). As observed earlier, while it might have been possible for Defendants to determine that Madoff was committing fraud from the "red flags" that Plaintiff points out, Plaintiff alleges no facts to demonstrate that Defendants actually did make such a discovery. Accordingly, Plaintiff's claim for commercial bad faith fails.

Because Plaintiff has not alleged Defendants' actual knowledge of Madoff's fraud with sufficient particularity, Count Three must be DISMISSED.

### IV.  Plaintiff Fails to State a Claim in Negligence

To establish a claim for negligence under New York law, "a plaintiff must establish that (1) the defendant owed the plaintiff a cognizable duty of care as a matter of law; (2) the defendant breached that duty; and (3) plaintiff suffered damage as a result of that breach." In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765, 830 (S.D.N.Y. 2005). The most basic element of a negligence claim is the existence of a duty owed to plaintiffs by defendants. See generally Palsgraf v. Long Island R.R. Co., 162 N.E. 99 (1928).

In Count Four of the Complaint, Plaintiff alleges that, after becoming aware that Madoff was committing fraud, Defendants "became duty-bound to protect [Madoff's] depositors

from Madoff's malfeasance." (Compl. ¶ 118.) Plaintiff further
alleges that Defendant JPMC "breached this duty by failing to
take any action following its investigation of Madoff other than
the withdrawal of its own assets from Madoff-related investment
vehicles." (Id. ¶ 119.) Plaintiff states that Defendants'
"breach of their duty of care caused [P]laintiff to suffer
damages by permitting Madoff to convert its funds for his own
use." (Id. ¶ 120.)

Likewise, in Count Five, Plaintiff claims that "[b]etween
September 1, 2008 and December 11, 2008, the activity in the
Chase Account was extremely volatile and did not comport with
the banking patterns Madoff had demonstrated for the prior
decade." (Compl. ¶ 129.) Plaintiff states that "the erratic
signs of withdrawal activity and transfers of money from
overseas imposed a duty on [Defendants] to investigate Madoff to
ensure that Madoff was not diverting fiduciary funds and to take
appropriate action based upon that investigation, including to
shut down the Chase Account." (Id. ¶ 130.) Plaintiff further
states that Defendants breached that duty by taking no action
with respect to the account, and that Defendants' breach caused
Plaintiff to suffer damages. (Id. ¶¶ 131-32.)

These allegations do not indicate that Defendants owed any
duty of care to Plaintiff whatsoever. First of all, Plaintiff
has utterly failed to plead any reason to impose on Defendant

17

JPMC a duty to third-party non-customers whose funds Madoff caused to be deposited in an account at Defendant Chase Bank. As to Defendant Chase Bank, it is evident that "banks do not owe non-customers a duty to protect them from the intentional torts of their customers." Musalli, 261 F.R.D. at 27. As Plaintiff itself states, "[t]he Chase Account belonged to BMIS." (Compl. ¶ 25.) Under these facts, Defendant Chase Bank owed a duty to BMIS, not to Plaintiff.

However, Plaintiff alleges that investors' "[c]hecks were deposited into the Chase Account with the appropriate customer account number indicated on the face of the check." (Compl. ¶ 25.) Plaintiff claims that, because of this and other indications, "the fact that the monies were not Madoff's or BMIS's but rather belonged to the victim and were being received by BMIS as a fiduciary was plain on the face of the deposits." (Id.) In its Opposition to Defendants' Motion to Dismiss, Plaintiff argues that banks may owe a duty to non-customers to monitor fiduciary accounts where "there are facts . . . indicating misappropriation." (Pl.'s Opp'n 32 (citing Renner v. Chase Manhattan Bank, No. 98 Civ. 926, 1999 WL 47239, at *14 (S.D.N.Y. 1999)).)

However, as Renner itself notes, "[i]n order for a bank to be liable for the diversion of fiduciary funds, plaintiff must show that the bank either itself benefited from the transaction

18

or that it had notice or knowledge that a diversion was intended or was in progress." Renner, 1999 WL 47239, at *14.   As explained above, Plaintiff has failed to plead any facts to show that Defendants either received any benefit or had knowledge that Madoff was committing fraud.[2]   Therefore, this case does not fit within the exception outlined in Renner.

Because Plaintiff has not alleged any facts indicating that Defendants owed a duty of care to Plaintiff, Count Five must be DISMISSED.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is GRANTED in its entirety.   The Clerk of the Court is directed to close this case.

---

[2]   Moreover, the Complaint itself indicates that the Chase Account was a demand deposit account, not a fiduciary account.   (See Compl. ¶ 24 (alleging that "Madoff had billions of dollars on deposit in [Defendant] Chase Bank" and that "[t]hese were demand deposits").)

19

SO ORDERED:

_____
Barbara S. Jones
UNITED STATES DISTRICT JUDGE

Dated:     New York, New York
           July 14, 2010